

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed March 26, 2024**

**United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
SAN ANGELO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| WILLIAM GLENN JOHNS, | § | CASE NO. 21-60010-rlj7 |
| | § | |
| Debtor. | § | |

## MEMORANDUM OPINION

William Glenn Johns filed his chapter 7 bankruptcy petition and, in doing so, claimed his self-directed Roth IRA as exempt from the bankruptcy estate.[1]  ECF No. 1, Sched. C.[2]  He listed *one* creditor, a collection company purportedly collecting a debt of over $2 million owed to David Rutan.  *Id.*, Sched. E/F.  Despite this, several other creditors filed claims in Johns's bankruptcy.  For the matter at hand, the relevant creditors are David and Michelle Rutan and Integral 4RMT, LLC[3] (collectively, the "Rutans").  The Rutans and the chapter 7 trustee, Roddrick Newhouse ("Trustee"), objected to Johns's exemption claim to his self-directed Roth IRA.

---

[1] "IRA" refers to an individual retirement account.

[2] "ECF No." refers to the numbered docket entry in the Court's electronic case file for Case No. 21-60010.

[3] Integral 4RMT, LLC is an entity related to the Rutans.

For the reasons set forth below, the Court sustains the Trustee's and Rutans' objection and disallows Johns's exemption claim to the IRA.

## BACKGROUND

### I.      The Bankruptcy

Johns filed his chapter 7 petition on February 3, 2021.  ECF No. 1.  His bankruptcy schedules reveal an individual with few assets and limited income.  Johns exempted his only asset of substantial value—a self-directed Roth IRA, which he values in his schedules at $250,000.[4]  *Id.*  Johns makes his exemption under 11 U.S.C. § 522(d)(12).[5]

Together the Trustee and Rutans objected to Johns's exemption of the IRA.  They contend that the IRA is not tax exempt because of "prohibited transactions" and "excessive contributions" that thereby disqualify the IRA as an exempt retirement fund under § 522(d)(12).

The Trustee and Rutans filed their original objection to Johns's exemptions on January 6, 2022.  ECF No. 73.  They then "supplemented" their objection on October 3, 2022.[6]  The Court heard six days of testimony and evidence[7] and permitted the parties to submit post-trial briefs in lieu of closing arguments.[8]

---

[4] Johns amended his schedules and Statement of Financial Affairs on October 30, 2023—over two years after filing his original schedules, and after the trial concluded.  ECF Nos. 373 & 374.  In his amended schedules, he maintains that his IRA is valued at $250,000, but the amendment includes a "breakdown" of how that value was derived.  *See* ECF No. 373 at 4.

[5] Hereinafter, "section" or "§" refers to 11 U.S.C., the Bankruptcy Code, unless otherwise stated.

[6] Due to a failure to redact sensitive information, the supplemental objection was refiled with redactions on May 22, 2023 [ECF No. 306]; the supplement was permitted by the Court [ECF No. 209].

[7] The trial occurred on May 31, 2023, June 1, 2023, June 13, 2023, June 14, 2023, July 25, 2023, and August 2, 2023.

[8] The Court issued a briefing schedule [ECF No. 349], and the parties timely filed their briefs.  The Trustee and Rutans filed their brief on August 29, 2023 [ECF No. 355], Johns filed his response on September 18, 2023 [ECF No. 360], and the Trustee and Rutans replied on September 25, 2023 [ECF No. 363].

Not every transaction involving the IRA is described below; instead, the Court focuses on the facts of the IRA's structure, history, and transactions that impact Johns's exemption claim.

Pertinent to the discussion on excess contributions, Johns was born in 1963; his age determines the amount he is eligible to contribute toward his IRA.

## II.   NuView IRA

Johns established his self-directed IRA with an application he signed and submitted to NuView IRA, Inc. on December 27, 2016.  Debtor Ex. 1.  In the application, Johns specified the account would be a Roth IRA, and he acknowledged NuView as the Administrator of the account.  Over three years, Johns made three separate contributions to his IRA totaling $19,000: he contributed $6,500 in 2016, $6,500 in 2017, and $6,000 in 2018.  Debtor Ex. 2.  Johns's Roth IRA is self-directed, meaning Johns "take[s] complete responsibility for any investments [he] choose[s]" for the IRA.  Debtor Ex. 1 at 4.  Johns's self-directed Roth IRA made two investments at his direction.  Debtor Ex. 3.  His IRA first invested $13,000 in a land trust named Carswell Cherokee Trust.  *Id*. at 1–2.  The IRA's second investment placed $5,900 in another land trust called Southeast Financial Trust.  *Id*. at 3–4.  The IRA has multiple levels; as Johns said, "it runs together sometimes."[9]

Johns's tax returns for the three years he funded his IRA showed total income of $2,673 for 2016, $2,446 for 2017, and $2,738 for 2018.  Debtor Ex. 4.  Nearly two years after filing his bankruptcy petition, Johns filed amended tax returns on November 28, 2022.  Debtor Ex. 5.  By his amended tax returns, Johns reported total income in the amounts of $9,173 for 2016, $8,946 for 2017, and $8,738 for 2018.  *Id*.

---

[9] Johns made this statement in his May 31, 2023 testimony at 3:05:39 P.M.

From at least 2016 to the present, Johns worked for and with an individual named Terrell Sheen.  Sheen is a real estate investor who uses trusts and other entities as a way to manage and control his investment properties.  Johns and Sheen met at a real estate convention in Florida many years ago, became friends, and developed a mutually beneficial business relationship.  For the past several years, Johns has served as a "trustee" for many of Sheen's trusts and manages properties for various entities controlled by Sheen.  For the tax years that Johns contributed to his IRA, he was paid for various services by two entities, TSU Control, LLC and A Trust Services Trust—both are Sheen's creations.[10]  Despite managing properties for Sheen, Johns claims, and so testified, that he "was just a name and a signature" for Sheen.  But such description is overly simplistic and meant to distract from the convoluted and complex transactions effected as a result of their relationship.

In late 2016, Sheen advised Johns that he should prepare for his retirement and recommended that Johns establish a self-directed Roth IRA; to facilitate this, Sheen—through one of his entities—paid Johns the funds that he used for opening his IRA.[11]  This is where Johns's IRA converges with the creation of Carswell Cherokee Trust.

### A.  Carswell Cherokee Trust

Generally, Carswell Cherokee Trust is a trust that manages real estate and mobile homes and sells improvements for mobile homes.  Carswell began thanks to Johns's talent for, as was described, "bird dogging" for deals.  Johns found a deal to buy real estate and a collection of mobile homes and associated notes (notes payable from buyers of the mobile homes).  Beginning

---

[10] In his tax returns for 2016, 2017, and 2018, Johns specifies that his principal business or service is "work for TSU Control LLC."  Debtor Exs. 4 & 5.

[11] Johns failed to report all of the payments he received from Sheen's entities in his original tax returns; he submits that his amended returns fix his inadvertently unreported income.

in October 2016, Johns and Sheen began negotiations to purchase the assets from the seller,
Denny L. Taylor and Taylor Repo, Inc.

In late 2016, Johns created his IRA.  The plan was that Johns, Sheen, and Sheen's wife,
Cathy Sheen, would use their separate IRAs to create a trust that would then purchase the Taylor
Repo assets.  Johns set-up his IRA through NuView as discussed above.  Johns along with
Terrell Sheen and Cathy Sheen used their IRAs to establish Carswell Cherokee Trust for the
benefit of their respective IRAs.[12]  The Carswell Cherokee Trust was created on December 30,
2016.  Debtor Ex. 6.  Then on January 4, 2017, Johns had NuView "invest" $13,000 in Carswell
Cherokee Trust.  Debtor Ex. 3.  The Sheens presumably made their contributions to Carswell
Cherokee Trust in a similar fashion through their IRAs.  The trust agreement splits the beneficial
interest in Carswell Cherokee Trust among Johns's IRA (49%), Terrell Sheen's IRA (41.73%),
and Cathy Sheen's IRA (9.27%).  Debtor Ex. 6; Trustee Ex. 25.  The trust agreement states the
trust is a land trust governed by Florida law.  *Id*.  Carswell Cherokee Trust then acquired title to
the Taylor Repo assets through a three-part sale on January 11, 2017.  *See* Trustee Exs. 16, 17,
18, & 19.  The sale was between Denny Taylor as seller and Hampton Beesley, Trustee, on
behalf of Carswell Cherokee Trust as the buyer.[13]

The financing for the Taylor Repo purchase is important for the discussion of prohibited
transactions.  Each part of the three-part sale had separate forms of consideration.  For the first
purchase and sale agreement, the purchase price is listed as $735,145.31, with $547,382 payable
to Denny Taylor at closing and the balance to be paid to certain banks in satisfaction of the debts

---

[12] The propriety of this arrangement—i.e., an IRA as a settlor of a trust—is not addressed here as it was not raised by
the parties.

[13] Hampton Beesley was the original trustee of Carswell Cherokee Trust.  In 2021, Beesley passed away and a
subsequent trustee, Brian Anderson, stepped in.  *See* Trustee Exs. 24, 25, & 26.  The resignation of Hampton Beesley
as trustee and appointment of Brian Anderson is also documented in a notarized document titled "Affidavit of
Resignation & Appointment of New Trustee," which was notarized on February 24, 2021.  Trustee Ex. 24.

owed by Taylor to those banks.[14]  Trustee Ex. 16 ¶ 4.  The testimony and supporting documents

reflect that the Sheens' IRAs fronted over $550,000.  *See* Trustee Ex. 23.  Importantly, Johns

testified that the money provided by the Sheens was to be repaid, and he produced a one-

sentence, one-party written "agreement" for repayment.[15]  Debtor Ex. 39.  Under the second

purchase and sale agreement, Carswell Cherokee Trust assumed[16] the debt that Taylor Repo

owed to PrimeSouth Bank, in the amount of $1,147,267.63.[17]  Trustee Ex. 17.  The same day the

Taylor Repo sale closed, Carswell Cherokee Trust issued a promissory note in favor of Terrell

Sheen's IRA to repay the $1,147,267.63.  Debtor Ex. 11.  Apparently, the promissory note was

to provide additional "security" for repayment of the debt owed to PrimeSouth Bank.  *Id*. ¶ 15.  It

is not clear why Terrell Sheen's IRA would be owed for Carswell Cherokee Trust's assumption

of Taylor Repo's debt—especially considering, per Johns's testimony, that Sheen did not make

payments on that debt.  For the third and final purchase and sale agreement, the consideration

was "the inducement by [Carswell Cherokee Trust] to enter into Agreement I and Agreement

II…."[18]  Trustee Ex. 18.

An accident in January 2017 left Johns injured and in need of help managing various

properties.  Enter Shannell Smith—a long-term tenant of property managed by Johns and friend

---

[14] In the first purchase and sale agreement, Carswell Cherokee Trust purchased the notes and inventory owned by Taylor Repo.  Trustee Ex. 16.

[15] The entirety of the agreement reads: "It is agreed that all monies owed including but not limited to contributions and loans are to be reimbursed or paid before any profits are divided among interested beneficiaries."  Debtor Ex. 39. And the only party to the agreement is "Carswell Cherokee Trust."  *Id*.

[16] In his testimony, Johns claimed the agreement was not an assumption of debt but an agreement to pay the debts. The nuances of any distinction are not necessary to this discussion.

[17] In the second purchase and sale agreement, Carswell Cherokee Trust purchased land and mobile homes from Taylor Repo.  Trustee Ex. 17.

[18] In the third purchase and sale agreement, Carswell Cherokee Trust acquired more land and certain rights to land (like various easements).

of Johns.  Smith made her mark with her management of many properties and impressed Sheen

and Johns so much that she was appointed trustee of several other trusts.  She was responsible for

managing the Carswell Cherokee Trust properties in Georgia, while other Texas properties of the

trust were handled by "the Texas office" (ostensibly by Sheen or his agents).  There are two

unique features of Smith's property-management style that should be highlighted: a tendency to

commingle funds and to draw her compensation from commingled accounts.  Smith has no

formal training in accounting or bookkeeping.

Smith helped Johns manage Carswell Cherokee Trust property; she was not, however, the

trustee.  She opened a bank account that she dubbed "American Management Trust dba Taylor

Repo and Trust Services."  The purpose of this account was to take-in the funds from the Taylor

Repo properties; in fact, Smith included the "dba Taylor Repo and Trust Services" in the account

name to make it easier to deposit checks payable to Taylor Repo.  *See* Trustee Ex. 153.  One

problem with the account is that Smith used it for other properties that she manages.

Consequently, it is impossible to determine what funds are whose.  Smith said that she keeps

track of the funds with a spreadsheet.  *See* Debtor Ex. 35.  But when questioned about the

spreadsheet, she was unable to explain several discrepancies.  One issue with the spreadsheet is

that it does not account for the funds from the Carswell Cherokee Trust, which is problematic

because the American Management Trust account was specifically established to manage the

income and other funds derived from the Carswell Cherokee Trust properties.  Also problematic

is that Smith used funds from the American Management Trust account to pay the mortgage and

bills on a property where Johns stayed for upwards of four months a year.  Johns and Smith

maintain that those payments were made by entities other than Carswell Cherokee Trust,

however.  From the evidence, the Court cannot determine to any degree of certainty who owned

the money that left the American Management Trust bank account to pay expenses of the property where Johns periodically resides. That property is owned by Sheen through his trust named Rideout Blalock Trust; Smith paid the mortgage and other utilities of the property out of the American Management Trust account. *See* Trustee Ex. 109; Debtor Ex. 35. There has been no formal tracing of the funds used to pay those expenses.

Another characteristic of Smith's management style was her habit of withdrawing funds with, she says, the intent to pay back amounts withdrawn—frequently by deferring her future pay checks.[19] The advances arose in different contexts and covered different expenses—from her purchase of Louis Vuitton luggage and Walt Disney World tickets to payment of her daughter's college tuition. *See* Trustee Ex. 153 at 289, 421, & 475. What is certain is Smith took advances from the American Management Trust account. The evidence, particularly Smith's testimony, reveals the account was in fact *her* personal account—not some entity's account.

Approximately five months after acquiring the Taylor Repo properties, Carswell Cherokee Trust acquired more income-producing properties—this time from Michael and Jill Hobbs (the transaction is referred to as the "Hobbs transaction"). *See* Trustee Exs. 20, 21, & 22. The purchase price for those properties was $237,085.29 due at closing and the assumption of debt in the amount of $449,423.55. Trustee Exs. 20 & 21. Johns said the cash at closing came from a third-party, Caleb Walsh, who simultaneously purchased a portion of the properties from Carswell Cherokee Trust when the trust purchased the property.[20] This contradicts the most recent balance sheet of assets and liabilities of Johns's IRA, which lists a debt owed to "Sheen's

---

[19] There is a question whether Smith in fact paid back the money she took from the account.

[20] Johns also testified that Caleb Walsh purchased some property shortly after the Taylor Repo sale. But that sale was financed by Carswell Cherokee Trust, and Walsh defaulted, which resulted in Carswell Cherokee Trust holding a judgment that was worth approximately $1.6 million in 2019; now after interest and fees, the judgment is worth $2.1 million. *See also* ECF No. 295 at 2.

IRA" for the down payment on the Hobbs property.[21]  ECF No. 295 at 5.  From the evidence, the Court concludes that Sheen's IRA loaned the funds for the Hobbs transaction to Carswell Cherokee Trust.[22]

The testimony on the decision-making process for Carswell Cherokee Trust paints a convoluted picture.  On some level, Sheen, Smith, and Johns had frequent discussions concerning the acquired properties, and all three had some level of input in the management of those properties.  Smith is responsible for collections and evictions, and she occasionally enlisted Johns's help.  In contrast, the named trustee, Brian Anderson, merely signed the paperwork that Sheen instructed him to sign.

Johns occasionally uses a small office at Carswell Cherokee Trust's office in Georgia.

In summary, Carswell Cherokee Trust funded its acquisition of properties with loans issued by the Sheens, and the funds in the account for American Management Trust are commingled to the point that the allocation of the account's funds is undeterminable.  The account includes funds from Carswell Cherokee Trust.  And the loans made by the Sheens' IRAs also account for their IRAs' respective interests—Terrell Sheen's 41.73% and Cathy Sheen's 9.27%—in Carswell Cherokee Trust.  As stated above, Johns's IRA's $13,000 contribution accounts for its 49% interest.

### B.  Southeast Financial Trust

The other asset of Johns's IRA is its interest in the Southeast Financial Trust.  Like Carswell Cherokee Trust, Southeast Financial Trust owns businesses and manages properties.  Its story begins with Sheen recommending that his son, Austin Sheen, do a deal with Johns.  Johns

---

[21] Johns filed his Amended Schedule of Assets and Liabilities for his IRA on May 9, 2023.  ECF No. 295.

[22] *See infra* Discussion, Part IV(A)(1)(c).

found a good business opportunity for them—a portable toilet business that was for sale.  So

Johns and Sheen agreed that Sheen (or his son) would front the money for a 49% interest in the

business; Johns's IRA would also get a 49% interest, while the prior manager of the business,

Christopher Magart (and his wife), would retain a 2% interest.  On December 18, 2017, Shannel

Smith and Johns signed the trust agreement creating the Southeast Financial Trust.[23]  Debtor Ex.

7.  Under the agreement, Johns's IRA is the sole settlor and sole beneficiary of Southeast

Financial Trust, and Smith is the trustee.  *Id.*  Johns then instructed NuView to "invest" money

from his IRA in Southeast Financial Trust.  Debtor Ex. 3.  Smith, as trustee of Southeast

Financial Trust, invested the money in the portable toilet business, Amerifirst Portalet & Pump

Service, LLC, and the property conveyed to the Southeast Financial Trust was a 49% interest in

the business.  Debtor Ex. 17; *see also* Trustee Ex. 33.

Amerifirst Portalet's operating agreement was signed on January 6, 2018 but bears an

"effective date" of December 19, 2017.  Trustee Ex. 33.  Amerifirst Portalet's operating

agreement states it is an Idaho LLC.  The document specifies as follows: that Giving Joy 10-

2015 Trust (Austin Sheen's trust) contribute $259,648.09 for a 49% interest in the company; that

Southeast Financial Trust contribute $5,600 for a 49% interest; and that the managers of the

business, Christopher and Katherine Magart, contribute their time and effort for a 2% interest.

*Id.*  From December 2017 to October 2019, Giving Joy Trust purports to have contributed

$664,554.06 to Amerifirst Portalet.  Debtor Ex. 19.  Like Carswell Cherokee Trust, all

---

[23] Southeast Financial Trust, according to its trust agreement, is a Florida land trust.  Debtor Ex. 7.

contributions to Amerifirst Portalet were to be repaid before distributing profits.[24]  Debtor Ex.

18.

Amerifirst Portalet held a bank account at US Bank under the name "Amerifirst Portalet

& Pump Service LLC dba Tams Traveling Toilets" and later opened an account at PrimeSouth

Bank under the name "Amerifirst Portalet and Pump Service, LLC d/b/a Peacock Pumping and

Portalet."[25]  *See* Trustee Exs. 34, 77, & 78

Shortly after Amerifirst Portalet's creation, on January 18, 2018, it purchased assets from

Tam's Traveling Toilets, LLC.  Trustee Ex. 43.  The total purchase price was $430,000 with

$170,000 paid as a down payment and the balance seller-financed.  Tam's Traveling Toilets, not

content with holding a security interest in only the assets sold, demanded "additional security";

Johns agreed, with Sheen's approval, to use the property held in another trust, the Sheen

Foundation 51 Trust, as additional security to purchase Tam's Traveling Toilets.  The additional

security is in the form of a promissory note that Johns signed as trustee of the Sheen Foundation

51 Trust and made payable to Tam's Traveling Toilets.  Debtor Ex. 20 at 6; Trustee Ex. 44.

Johns is the named trustee of Sheen Foundation 51 Trust, and the two beneficiaries are 252

Equity Trust and Stagecoach Enterprises, Inc.  Debtor Ex. 37.  While the listed beneficiaries are

not individuals, Sheen controls the property of those beneficiaries.  The Winona Beach Resort in

Washington state was held in the Sheen Foundation 51 Trust, and Johns managed the property

per Sheen's directions.  And with Sheen's blessing, Johns used the Winona Beach Resort as

---

[24] The language in the Amerifirst Portalet agreement to repay is the exact same as the Carswell Cherokee Trust agreement: "It is agreed that all monies owed including but not limited to contributions and loans are to be reimbursed or paid before any profits are divided among interested beneficiaries."

[25] The US Bank account was opened in January 2018 when Amerifirst Portalet purchased a portable toilet business in Idaho.  *See* Trustee Exs. 34 & 43.  The PrimeSouth account was opened in March 2019 when Amerifirst Portalet purchased a portable toilet business in Georgia.  *See* Trustee Exs. 45, 46, & 77.

additional security for the seller-financed acquisition of property for Southeast Financial Trust.[26] *See* Trustee Exs. 43 & 44.

A problem shared by Carswell Cherokee Trust and Southeast Financial Trust is that bank accounts associated with each trust made payments to Johns's mother and Johns's then-girlfriend.  Johns testified that he had not had a credit card since before 2008; instead, he used his mother's and his girlfriend's credit cards for various purchases—particularly for dining-out and groceries.[27]  Sheen would later approve the reimbursement of those purchases, as per an unwritten arrangement between him and Johns.  Likewise, Johns's girlfriend worked with Johns and for Sheen, and Sheen or Johns routinely approved the reimbursement of her work-related expenses.  The kicker in this arrangement is the source of the reimbursements—the American Management Trust account and an Amerifirst Portalet and Pump Service account.[28]  Smith also cut checks directly to Johns's mother to cover expenses that she paid—for example, Johns's mother would occasionally pay for lawn services for which she was reimbursed by Smith out of the American Management Trust account.

## DISCUSSION

From the history of Johns's IRA's investments, it is evident that financial formalities were loosely followed, if at all, by the parties controlling the various properties that benefit

---

[26] The Winona Beach Resort was held in the trust named Sheen Foundation 51 Trust; under the governing trust agreement, Johns held the legal title to the trust.  The trust agreement is in the same form as the Carswell Cherokee Trust agreement and Southeast Financial Trust agreement and provides that the trustee, not the beneficiaries, hold legal and equitable title, like in a land trust.  But the trust agreement for the Sheen Foundation 51 Trust provides that Texas law governs the trust.  It is not clear, however, that Texas law allows for *both* legal and equitable title to vest in the trustee—this is a large distinction between trusts and land trusts.

[27] Within the application for his NuView IRA, Johns authorizes NuView to charge a credit card for the various fees associated with the self-directed IRA; the "name on the card" in the application is "W G Johns."  *See* Debtor Ex. 1, at 3.  There was discussion about whether his girlfriend's account had a card in his name, but he insisted that she never issued him a card in his name.

[28] As previously stated, those accounts hold funds in which Johns's IRA has an interest.

Johns's IRA.  But the Court must decide if Johns's involvement constituted "prohibited

transactions" or "excessive contributions" that thereby strip his IRA of its exemption under

§ 522(d)(12).

## I.    Jurisdiction

The Court's jurisdiction of this case and proceeding derives from 28 U.S.C. §§ 1334(b)

and 157(a), and the Northern District of Texas's Order of Reference of Bankruptcy Cases and

Proceedings Nunc Pro Tunc, Misc. Order 33.  This matter is a core proceeding.  28 U.S.C.

§ 157(b)(2)(A), (B), (E).

## II.    The Exemption and the Objection

Upon the filing of a bankruptcy petition, "all legal or equitable interests of the debtor in

property" become property of the bankruptcy estate.  11 U.S.C. § 541(a)(1); *Rousey v. Jacoway*,

544 U.S. 320, 325 (2005) (Thomas, J.); *Clark v. Rameker*, 573 U.S. 122, 124 (2014) (Sotomayor,

J.).  "'To help the debtor obtain a fresh start,' however, the Bankruptcy Code allows debtors to

exempt from the estate limited interests in certain kinds of property."  *Clark*, 573 U.S. at 124

(quoting *Rousey*, 544 U.S. at 325).  Those exemptions are provided at § 522 of the Bankruptcy

Code.  Exemption claims are construed liberally in favor of the debtor.  *In re Gandy*, 327 B.R.

807, 808 (Bankr. S.D. Tex. 2005).

The provision at issue here, § 522(d)(12), allows a debtor to exempt certain retirement

funds—funds that are exempt from taxation under § 408A of the Internal Revenue Code—from

the bankruptcy estate.  Johns claims his only substantial asset, his self-directed Roth IRA, as

exempt under § 522(d)(12).  The Trustee and Rutans allege that Johns's IRA is not tax exempt

and thus his exemption claim fails.  And the assets of the IRA therefore became property of the bankruptcy estate.[29]  Johns maintains his IRA is tax exempt.

## III.    The Burden of Proof

The party saddled with the burden of proof here must prove its case by a preponderance of the evidence.  *Rea v. Crum (In re Crum)*, No. 00-4013, 2002 Bankr. LEXIS 1948, at *10–11 (Bankr. N.D. Tex. Feb. 22, 2002); *In re Park*, 246 B.R. 837, 840 (Bankr. E.D. Tex. 2000). Neither party adequately addressed the question of who bears the burden given the objection to the exemption.[30]  And this point turns on whether an exemption under § 522(d)(12) is presumed to be valid under the Bankruptcy Code when no favorable determination letter by the IRS has been provided.  *See* § 522(b)(4)(A) & (B).

First, it is important to note that exemptions are limited.  *See generally Schwab v. Reilly*, 560 U.S. 770, 791 (2010) (Thomas, J.) ("The Code limits exemptions … because every asset the Code permits a debtor to withdraw from the estate is an asset that is not available to his creditors.").  Bankruptcy Rule 4003(c) specifies that the burden of proof is on the objecting party to prove the exemptions are not proper.[31]  But § 522(b)(4) applies two different standards for exemptions of retirement funds.  The first standard provides that retirement funds are presumed exempt if the fund has received a favorable determination by the IRS;[32] if so, the objecting party

---

[29] As provided by § 522(l), "[u]nless a party… objects, the property claimed as exempt… is exempt."  *See generally Taylor v. Freeland & Kronz*, 503 U.S. 638, 112 S. Ct. 1644 (1992).

[30] While the Trustee and Rutans are silent on the matter, Johns's closing brief looks to Bankruptcy Rule 4003 to argue that the objecting party bears the burden.  ECF No. 360 at 5.

[31] "Bankruptcy Rule" refers to the Federal Rules of Bankruptcy Procedure.

[32] The Bankruptcy Code requires that the favorable determination letter arise from § 7805 of the Internal Revenue Code.  That provision of the Internal Revenue Code generally permits the Secretary of the Treasury to enact regulations.  The Secretary adopted regulations prescribing the procedure for obtaining a favorable determination in 26 C.F.R. § 601.201.  In fact, parties in contests over the tax-exempt nature of an IRA have provided favorable determination letters to courts.  *See Daley v. Mostoller (In re Daley)*, 717 F.3d 506, 508 (6th Cir. 2013) ("A letter from the IRS stated that Merrill Lynch's IRAs 'satisf[ied] the requirements of' the retirement-account exemption.")

then bears the burden to prove the retirement funds are not properly exempt, much like the burden in Rule 4003(c).  § 522(b)(4)(A); *see In re Drumheller*, 574 B.R. 422 (Bankr. D. Mass. 2017).

But when the retirement fund has *not* received a *favorable* determination from the IRS, the debtor bears the burden.  § 522(b)(4)(B).  To meet his burden, the debtor must show that (1) no prior determination to the contrary has been made, and (2) the retirement fund is in substantial compliance with the Internal Revenue Code, or, if not, that the debtor is not materially responsible for the noncompliance.  § 522(b)(4)(B).[33]

Johns did not offer evidence of a favorable determination letter, but the Trustee and Rutans have not argued that the burden shifted to Johns under § 522(b)(4).  In similar situations, courts have *presumed* there was a favorable determination letter; those courts reason that by not raising the issue, the objecting parties waived arguments based on the lack of a favorable ruling. *See In re James*, 489 B.R. 731, 739 (Bankr. E.D. Tenn. 2013) (citing *In re Willis*, No. 07-11010-BKC-PGH, 2009 WL 2424548, at *5 (Bankr. S.D. Fla. Aug. 6, 2009)).  These courts rely on the

---

(alteration in original); *In re Willis*, No. 07-11010-BKC-PGH, 2009 Bankr. LEXIS 2160, 104 A.F.T.R.2d (RIA) 2009-5669 (Bankr. S.D. Fla. Aug. 6, 2009) (the IRS issued a letter qualifying that the custodial agreement was proper); *Daniels v. Agin*, 736 F.3d 70 (1st Cir. 2013) (holding an audit is insufficient to qualify as a favorable determination for purposes of § 522(b)(4)).

[33] In its entirety, § 522(b)(4) reads:
    (4) For purposes of paragraph (3)(C) and subsection (d)(12), the following shall apply:
        (A) If the retirement funds are in a retirement fund that has received a favorable determination under section 7805 of the Internal Revenue Code of 1986, and that determination is in effect as of the date of the filing of the petition in a case under this title, those funds shall be presumed to be exempt from the estate.
        (B) If the retirement funds are in a retirement fund that has not received a favorable determination under such section 7805, those funds are exempt from the estate if the debtor demonstrates that—
            (i) no prior determination to the contrary has been made by a court or the Internal Revenue Service; and
            (ii)(I) the retirement fund is in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986; or
              (II) the retirement fund fails to be in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986 and the debtor is not materially responsible for that failure.

Supreme Court's reasoning in *Taylor v. Freeland & Kronz*, 503 U.S. 638, 112 S. Ct. 1644 (1992). *See In re James*, 489 B.R. at 735. With due respect to those courts, the reliance on *Taylor* is misplaced. In *Taylor*, the Court addressed whether a trustee may object to an exemption "after the 30-day period if the debtor had no colorable basis for claiming the exemption." *Taylor*, 503 U.S. at 639. For context, Bankruptcy Rule 4003 requires objections to exemptions be brought within a 30-day period after the § 341 meeting of creditors. Fed. R. Bankr. P. 4003(b)(1). The Court held that the Bankruptcy Code and Bankruptcy Rules do not allow the trustee to object to exemptions after the 30-day deadline. *Taylor*, 503 U.S. at 642–46. Relying on *Taylor* for the premise that exemptions are *presumably* correct is not justified; the Court made no mention of such a presumption, it merely limited the time for objecting to the exemptions. *See id*.

In contrast, other courts have found that even when a favorable determination letter is provided, such proof does not always give rise to the presumption that the retirement funds are exempt. *See Jie Xiao v. Chorches*, 610 B.R. 183, 190–91 (D. Conn. 2019). For example, in *Jie Xiao*, a favorable IRS determination letter was provided, but it was premised on a pension plan that was subsequently amended, and the amended plan was not considered by the IRS. *Id*. The district court thus affirmed the bankruptcy court's holding that the IRS determination was not effective at the time of the debtor's bankruptcy petition and thus did not give rise to a presumption under the Code. *Id*. The burden was placed on the debtor to prove his exemption was proper. *See id*. at 191–194.[34]

---

[34] *See also RES-GA Dawson, LLC v. Rogers (In re Rogers)*, 538 B.R. 158, 172–73 (Bankr. N.D. Ga. 2015) (holding an IRS opinion letter blessing a "prototype plan" is not sufficient for § 522(b)(4)(A)).

So the question remains—what should the Court do when no proof of an IRS determination is provided and the objecting parties do not argue the burden was shifted to the debtor?  A simple reading of the Bankruptcy Code resolves the issue.

Beginning with § 522(l), the debtor shall file a list of property that he claims as exempt. The debtor did so in this case.  *See* Debtor Pet., Sch. C, ECF No. 1.  The exemption stands *unless* an interested party objects.  § 522(l).  Bankruptcy Rule 4003(b) sets the time for an objection. The Trustee and Rutans timely objected.[35]  Bankruptcy Rule 4003(c) specifies that the "objecting party has the burden of proving that the exemptions are not properly claimed."  But while the objecting party generally bears the burden under Bankruptcy Rule 4003(c), § 522(b)(4) explicitly addresses the burden of proof for an exemption claim of retirement funds under § 522(d)(12).

First, there is no evidence that the IRS ever blessed Johns's IRA with a favorable determination letter.  The Court thus looks past § 522(b)(4)(A) and begins the analysis under paragraph (b)(4)(B), which provides that retirement funds:

> are exempt from the estate *if the debtor* demonstrates that—
>     (i) no prior determination to the contrary has been made by a court or the Internal Revenue Service; and
>     (ii) (I) the retirement fund is in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986; or
>       (II) the retirement fund fails to be in substantial compliance with the applicable requirements of the Internal Revenue Code of 1986 and the debtor is not materially responsible for that failure.

§ 522(b)(4)(B) (emphasis added).  The burden lies with the debtor.  The Court finds that no prior determination has been issued by the IRS on the validity of Johns's IRA.  The issue is, therefore,

---

[35] Throughout this case, various agreed extensions to the deadline to object to exemptions were filed [ECF Nos. 29, 34, & 56], and the Court granted those extensions [ECF No. 32, 39, & 63].  In the end, the final deadline was January 7, 2022.  ECF No. 63.  The Trustee and Rutans filed their objection to Johns's claimed exemption on January 6, 2022. ECF No. 73.

whether the IRA *substantially complies* with the Internal Revenue Code, and if not, was Johns

*materially responsible* for that non-compliance.  § 522(b)(4)(B).

With this framework in mind, the linchpin of the Trustee's and Rutans' argument is that

Johns's IRA fails to substantially comply with the Internal Revenue Code because of Johns's

prohibited transactions and excessive contributions, which render all—or some portion—of the

account taxable and thus a non-qualifying exemption under § 522(d)(12).  Johns argues that his

Roth IRA complies with the Internal Revenue Code, and even if there is any non-compliance,

that non-compliance was due to someone else's misconduct.

## IV.    Johns's Roth IRA's Status as Tax Exempt

To understand the arguments, the Court shifts from the Bankruptcy Code, 11 U.S.C., to

the Internal Revenue Code, I.R.C.  Section 408A of the Internal Revenue Code defines Roth

IRAs.  "[T]he term 'Roth IRA' means an individual retirement plan (as defined in section

7701(a)(37)) which is designated … at the time of establishment of the plan as a Roth IRA."

I.R.C. § 408A(b).  The definition section of the Internal Revenue Code, specifically

§ 7701(a)(37), defines "individual retirement plan" as "an individual retirement account

described in section 408(a)[.]"  Section 408 governs IRAs, which are:

> trust[s] created … in the United States for the exclusive benefit of an individual … ,
> but only if the written governing instrument creating the trust meets the following
> requirements:
>
> > (1) Except in the case of a rollover contribution … , no contribution
> > will be accepted unless it is in cash, and contributions will not be accepted
> > for the taxable year on behalf of any individual in excess of the amount in
> > effect for such taxable year under section 219(b)(1)(A).
> >
> > (2) The trustee is a bank … or such other person who demonstrates
> > to the satisfaction of the Secretary that the manner in which such other
> > person will administer the trust will be consistent with the requirements of
> > this section.
> >
> > (3) No part of the trust funds will be invested in life insurance
> > contracts.

(4) The interest of an individual in the balance in his account is nonforfeitable.

(5) The assets of the trust will not be commingled with other property except in a common trust fund or common investment fund.

(6) Under regulations prescribed by the Secretary, rules similar to the rules of section 401(a)(9) and the incidental death benefit requirements of section 401(a) shall apply to the distribution of the entire interest of an individual for whose benefit the trust is maintained.

I.R.C. § 408(a).

The takeaway is that a Roth IRA is an IRA that satisfies § 408 of the Internal Revenue Code and is designated as a *Roth IRA* when established. A Roth IRA is treated in the same manner as an IRA except as provided by § 408A. *See* I.R.C. § 408A(a).

Section 408(e)(1) of the Internal Revenue Code exempts an IRA from taxation. And again, retirement funds may be exempted from the bankruptcy estate under § 522(d)(12) to the extent those funds are in an account exempt from taxation under, *inter alia*, §§ 408 and 408A of the Internal Revenue Code. But there are exceptions in § 408(e) of the Internal Revenue Code that cause an IRA to lose its tax-exempt status. One such exception is provided by paragraph (2) of § 408(e).[36] Subsection 408(e)(2) dictates that an IRA ceases to be an IRA due to a prohibited transaction, whereby the individual for whose benefit the account is established engages in a transaction prohibited by § 4975 of the Internal Revenue Code.[37] The Trustee and Rutans assert Johns engaged in prohibited transactions.

---

[36] Section 408(e)(1) also states that an individual retirement account is not tax exempt by way of paragraph (3). That paragraph describes the "effect of borrowing on an annuity contract," which only applies to retirement annuities. I.R.C. § 408(e)(3). An individual retirement annuity, as defined in Internal Revenue Code § 408(b), is distinct from an IRA defined in § 408(a) and thus irrelevant to this discussion.

[37] In full, I.R.C. § 408(e)(2) provides:
    **(2) Loss of exemption of account where employee engages in prohibited transaction**
        **(A) In general**
        If, during any taxable year of the individual for whose benefit any individual retirement account is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to such account, such account ceases to be an individual retirement account as of the first day of such taxable year. For purposes of this paragraph-

The Trustee and Rutans also charge Johns with making excessive contributions to his IRA. Excessive contributions do not entirely cancel the tax-exempt status of an IRA. Instead, a tax is imposed on the *amount* of the excessive contributions, and the tax is to be paid by the owner of the account. I.R.C. § 4973. And because the amount of the excessive contribution is taxed, the excessive contribution cannot be exempt under 11 U.S.C. § 522(d)(12). Excessive contributions will be addressed below. *See infra* Discussion, Part IV(B).

### A. Prohibited Transactions

As stated above, an IRA loses its tax-exempt status when the "individual for whose benefit [the] individual retirement account is established … engages in any transaction prohibited by section 4975 with respect to such account." I.R.C. § 408(e)(1) & (2). The inquiry is two-fold: Was there a prohibited transaction under Internal Revenue Code § 4975? And was the individual for whom the account was established engaged in the transaction?[38]

### 1. Section 4975 of the Internal Revenue Code

A prohibited transaction, as defined by § 4975 of the Internal Revenue Code, is:

… any direct or indirect-

---

    (i) the individual for whose benefit any account was established is treated as the creator of such account,

    (ii) the separate account for any individual within an individual retirement account maintained by an employer or association of employees is treated as a separate individual retirement account, and

    (iii) each individual retirement plan of the individual shall be treated as a separate contract.

**(B) Account treated as distributing all its assets**

In any case in which any account ceases to be an individual retirement account by reason of subparagraph (A) as of the first day of any taxable year, paragraph (1) of subsection (d) applies as if there were a distribution on such first day in an amount equal to the fair market value (on such first day) of all assets in the account (on such first day).

[38] At trial, debtor's counsel highlighted the different consequences of when the beneficiary of an IRA engages in the prohibited transaction as opposed to when a disqualified person (who is not the beneficiary) engages in the prohibited transaction. Looking to § 4975(a) and (b) of the Internal Revenue Code, the taxes imposed on prohibited transactions "shall be paid by any disqualified person who participates in the prohibited transaction[.]" *See also* ECF No. 318 at 11–14. Notably the tax is not imposed on the account itself or the beneficiary, and so the tax seemingly does not affect the validity of the exemption under § 522, which allows an exemption for retirement funds "in a *fund or account that is exempt from taxation*." § 522(d)(12).

20

> (A) sale or exchange, or leasing, of any property between a plan and a disqualified person;
>
> (B) lending of money or other extension of credit between a plan and a disqualified person;
>
> (C) furnishing of goods, services, or facilities between a plan and a disqualified person;
>
> (D) transfer to, or use by or for the benefit of, a disqualified person of the income or assets of a plan;
>
> (E) act by a disqualified person who is a fiduciary whereby he deals with the income or assets of a plan in his own interest or for his own account; or
>
> (F) receipt of any consideration for his own personal account by any disqualified person who is a fiduciary from any party dealing with the plan in connection with a transaction involving the income or assets of the plan.

I.R.C. § 4975(c)(1).[39]

Before applying the statute to the case at hand, the Court will outline several examples that demonstrate the boundaries of what is and is not prohibited.

Beginning with a rather straight-forward case, in *Ellis v. Commissioner*, 787 F.3d 1213 (8th Cir. 2015), a taxpayer established a self-directed IRA that invested in an LLC. The LLC engaged in automobile sales and had two members: the taxpayer's IRA (which provided the initial capital for a 98% interest) and an employee (who retained the remaining 2%). *Id.* at 1214. The taxpayer was named the general manager of the LLC and was paid a salary. *Id.* at 1215. The Tax Commissioner sent a notice of deficiency because the IRA lost its status as an IRA and its entire fair market value was treated as taxable income due to the taxpayer's salary being a prohibited transaction. *Id.* The taxpayer petitioned to the tax court, and the court upheld the Commissioner's notice by determining the taxpayer engaged in prohibited transactions under I.R.C. § 4975(c)(1)(D) and (E). The Eighth Circuit affirmed the tax court. *Id.* at 1217. It was

---

[39] Section 4975 includes a broad definition of a "plan" that includes "an individual retirement account described in section 408(a)." I.R.C. § 4975(e)(1). Sections 4975(e)(1) and 408(a) say that IRAs are trust accounts.

undisputed that the taxpayer was a disqualified person because of his status as a fiduciary.[40]  *Id.*
at 1216.  The Eighth Circuit held that the taxpayer did transfer the income or assets of his IRA
for his benefit in violation of I.R.C. § 4975(c)(1)(D) and dealt with the income or assets of the
plan for his own benefit in violation of I.R.C. § 4975(c)(1)(E).  *Id.* at 1216–17.  The taxpayer
claimed that the LLC's funds were not *assets* or *income* of the plan and therefore not within the
purview of I.R.C. § 4975.  But the Eighth Circuit was not convinced because the language of
I.R.C. § 4975 prohibits "'direct and indirect' self-dealing of the income or assets of a plan[,]"
thus the plan asset rule should not shield the taxpayer's IRA from his prohibited transactions.[41]
*Id.* at 1217.  The final result in *Ellis* was that the taxpayer's IRA was deemed distributed the
same year it was established; thus, the taxpayer owed for his income-tax deficiency and penalties
assessed by the Tax Commissioner.

A slightly more abstract case is *Thiessen v. Commissioner*, 146 T.C. 100 (2016), where
the tax court held that the taxpayers' (a husband and wife) loan guaranties were prohibited
transactions because the guaranties were indirect extensions of credit to the taxpayers' IRAs and
prohibited under I.R.C. § 4975(c)(1)(B).  The taxpayers used an IRA to acquire the stock of a
corporation that they created.  *Id.* at 103–04.  The corporation then purchased the assets of a
metal fabrication business by providing an earnest money deposit and a promissory note for the
balance due.  *Id.* at 104–05.  Importantly, the note stated that the repayment was secured by both
the assets purchased and a *personal guaranty* issued by the taxpayers.  *Id.* at 105.  The court held

---

[40] Discussed more in-depth below, a fiduciary includes a person who exercises discretionary control over the plan.
*See* I.R.C. § 4975(e)(3).

[41] The plan asset rule is discussed below.  *See infra* Discussion, Part IV(A)(1)(a).  In short, the plan asset rule is a
regulation that states: "Generally, when a plan invests in another entity, the plan's assets include its investment, but
do not … include any of the underlying assets of the entity."  29 C.F.R. § 2510.3-101(a)(2).

that a guaranty is an indirect extension of credit and thus prohibited. *Id.* at 106–14.[42]

Ultimately, the taxpayers owed a deficiency for the year that they issued the guaranty because

their IRAs were deemed distributed to them that year.

Contrasting with the above cases, the Sixth Circuit in *Daley v. Mostoller (In re Daley)*

held that a debtor did not use his IRA to obtain credit and thus did *not* engage in a prohibited

transaction. 717 F.3d 506 (6th Cir. 2013). In *Daley*, the debtor opened an IRA with Merrill

Lynch and signed an agreement where the debtor granted a lien on the property he owns in any

Merrill Lynch account to cover any indebtedness owed to Merrill Lynch. *Id*. at 507. The debtor

did not owe any debts to Merrill Lynch when he opened the account or after. *Id*. The debtor also

did not use his IRA for collateral on any other form of indebtedness. *Id*. After the debtor filed

his chapter 7 petition, the chapter 7 trustee objected to him exempting his IRA on the grounds

that the agreement was a prohibited extension of credit. *Id*. at 508. The bankruptcy court and

district court agreed with the trustee, to be later reversed by the Sixth Circuit. *Id*. The Sixth

Circuit first noted that there is a favorable presumption when the account received a favorable

determination letter from the IRS, and in *Daley*, the trustee conceded the account had such a

letter. *Id*. Then turning to the extension of credit, the Sixth Circuit noted that no credit was ever

provided; Merrill Lynch never extended credit to either the plan or the debtor. *Id*. at 508–09.

"The lien provision was contingent on an event that never occurred, and above all could not

occur until [the debtor] opened a separate account," like a margin account. *Id*. at 509. On that

record, the Sixth Circuit held that the debtor did not engage in a prohibited transaction, so his

IRA was exempt from his bankruptcy estate. *Id*. at 510–11.

---

[42] An important but subtle takeaway from *Thiessen* is that the language "between a plan and a disqualified person" in I.R.C. § 4975(c) is not directional in nature—that is that the extension of credit can be *from* a plan *to* a disqualified person, or *from* a disqualified person *to* a plan.

*(a) Plan Assets*

Applying the statute in this case is complicated by the fact that I.R.C. § 4975(c)(1)

explicitly differentiates prohibited transactions between a *plan* (the IRA) and a disqualified

person (subsections (A) – (C)) and prohibited transactions between the *assets of a plan* and a

disqualified person (subsections (D) – (F)).  In this case, understanding what constitutes plan

assets is essential for determining whether certain transactions are prohibited and identifying

disqualified persons—i.e., fiduciaries.  Here, there are multiple levels within the plan (the IRA).

As stated, Johns's IRA holds a beneficial interest in two trusts that are designated as land

trusts—Carswell Cherokee Trust and Southeast Financial Trust.  But the property of the two

trusts is *not* just real property—they also include personal property and business interests.  Are

the assets of the trusts also assets of the IRA?  The short answer is yes, at least to the extent of

the IRA's beneficial interest in those trusts.  This is because the ownership of property that is

identified as trust property is split between the trustee of the trust and the beneficiary—the trust

itself does *not* own the property.  This relationship, specifically in the context of Florida land

trusts, is discussed more below.

Testimony was elicited concerning the "plan asset rule," also referred to as the "plan

asset regulation."[43]  The "rule" or "regulation" refers to the regulation enacted by the Department

of Labor that provides a definition of *plan assets*.  *See* 29 C.F.R. § 2510.3-101(a)(1).  That

regulation "describes what constitute[s] assets of a plan with respect to a plan's investment in

another entity for purposes of … section 4975 of the Internal Revenue Code."[44]  29 C.F.R.

---

[43] *See In re Correra*, No. 16-30728-SGJ-7, 2019 Bankr. LEXIS 907, at *30, 2019 WL 1313716, at *10 (Bankr. N.D. Tex. March 19, 2019) (referring to the "Plan Asset Rule" as "contained in" 29 C.F.R. § 2510.3-101); *Powell v. Ocwen Fin. Corp.*, No. 18-CV-1951 (VSB), 2023 U.S. Dist. LEXIS 95811, 2023 WL 3756847 (S.D.N.Y. June 1, 2023) (referring to 29 C.F.R. § 2510.3-101 as the "Plan Asset Regulation.").

[44] In this case, the "plan" is Johns's IRA.

§ 2510.3-101(a)(1).  The structure of the regulation—a general rule with an exception and two

exceptions to the exception—makes it difficult to distill into a simple rule statement.  The

labyrinthian regulation is best analyzed one step at a time.

The regulation begins: "Generally, when a plan invests in another entity, the plan's assets

include its investment, but do not … include any of the underlying assets of the entity."  29

C.F.R. § 2510.3-101(a)(2).  But there is an exception to this rule when the plan (the IRA) invests

in an "equity interest of an entity that is neither a publicly-offered security nor a security issued

by an investment company"—the situation for Johns's IRA's investments.  This exception

provides that the plan's (the IRA's) "assets include both the equity interest and an undivided

interest in each of the underlying assets of the entity[.]"  *Id.*  Then the regulation provides two

exceptions to the exception—that is when the general rule (that the plan's assets do not include

the underlying assets of the entity the plan invested in) does apply despite the exception being

seemingly satisfied.  The exceptions to the exception exist when "it is established that … [t]he

entity is an operating company, or [e]quity participation in the entity by benefit plan investors is

not significant."  *Id.*  And conveniently, the regulation defines, *inter alia*, "equity interests,"

"operating company," "real estate operating company," and "participation by benefit plan

investors."  *See* 29 C.F.R. § 2510.3-101(b)(1), (c), (e), & (f).

Applying the regulation, beginning with the basic rule, the IRA's assets do not include

the underlying investment's assets.  *See* 29 C.F.R. § 2510.3-101.  But here, Johns's IRA did not

invest in a publicly-offered security or a security issued by an investment company; the

exception therefore applies.  And so, the assets of the IRA include the assets of the underlying

investments.  That is so "unless it is *established*" that (1) the entity is not an operating company,

or (2) equity participation in the entity by benefit plan investors is not significant.  Johns did not establish either.

An "operating company" includes entities that satisfy the definition of a "real estate operating company."  29 C.F.R. § 2510.3-101(c)(1).  A "real estate operating company" is an entity with 50% or more of its assets invested in real estate, that has a right to invest in that real estate, and for a time engages in the management and development of that real estate.  29 C.F.R. § 2510.3-101(e).  It was not established that 50% or more of either Carswell Cherokee Trust's or Southeast Financial Trust's assets are in real estate.  The amended schedules of assets and liabilities for Carswell Cherokee Trust that Johns filed with the Court provide a "Contract Balance" of $3,967,404.99, a "Land Value" of $815,613.00, and a "Total" of $4,783,017.99.  Debtor Ex. 13.  Presumably, the "Contract Balances" refer to balances owed to Carswell Cherokee Trust on rental and rent-to-own mobile homes, but that is not certain.  With certainty, the Court can find that Carswell Cherokee Trust is engaged to some degree in investing and managing land, but to what degree is unclear.  Southeast Financial Trust clearly does not satisfy the "real estate operating company" definition—the values provided in Johns's IRA's schedule of assets and liabilities, if they can be believed, indicate that over half of the total "value" of Southeast Financial Trust is attributable to Amerifirst Portalet, which is not a real estate operating company.  Debtor Ex. 13.  In any case, it was not established that either Carswell Cherokee Trust or Southeast Financial Trust is an "operating company," and thus this exception (to the exception) does not apply.

On to the second exception to the exception.  This is when "[e]quity participation in the entity by benefit plan investors is *not* significant."  29 C.F.R. § 2510.3-101(a)(2)(ii) (emphasis added).  The plan asset regulation provides that "[e]quity participation in an entity by benefit

plan investors is 'significant' … if … 25 percent or more of the value of any class of equity interests in the entity is held by benefit plan investors." 29 C.F.R. § 2510.3-101(f)(1).  A "benefit plan investor" includes an IRA.  29 C.F.R. § 2510.3-101(f)(2)(ii).  And to clarify, "equity interest" includes a "beneficial interest in a trust."  29 C.F.R. § 2510.3-101(b)(1).  So, to rephrase the inquiry: equity participation is significant if 25% or more of the beneficial interests of the trusts are held by Johns's IRA.  Here, Johns's IRA is the 49% beneficiary of Carswell Cherokee Trust and the 100% beneficiary of Southeast Financial Trust.  The exception could not apply, and Johns did not establish that this exception should apply.

Simply stated, applying the plan asset regulation to this case, Johns's IRA's assets include the assets of its investments.

It gets more complicated.  The previously mentioned regulation applies to entities, but the Florida Land Trust Act provides that the instrument for a land trust "does not itself create an *entity*, regardless of whether the relationship among the beneficiaries and the trustee is deemed to be an entity under applicable law."[45]  Fla. Stat. § 689.071(3) (2022) (emphasis added).  More to the point, even if the trusts are "entities," neither the Florida Land Trust Act, nor the trust instruments, nor the Florida Trust Code gives the *trusts* ownership of the trust properties. Ownership of assets is not projected onto the trusts.  Thus, assuming the Carswell Cherokee Trust and the Southeast Financial Trust are valid Florida land trusts, the "plan asset rule" provided in the regulations is not applicable here.

---

[45] It is worth mentioning that the Bankruptcy Code includes "trusts" in the definition of "entity."  11 U.S.C. § 101(15). Ironically the trust agreements for Carswell Cherokee Trust and Southeast Financial Trust explicitly state "this agreement does not create a 'trust' under the definition as set forth in Section 301.7701-4(a) of the Procedure and Administration Regulations of the Internal Revenue Code."  Debtor Exs. 6. ¶¶ 6 & 16; 7 ¶¶ 6 & 16.  The trust instruments probably contain that language for tax purposes because § 301.7701-4 describes and defines various trust forms for tax purposes.  *See* 26 C.F.R. § 301.7701-4.

So, the question becomes: who *owns* the trust assets if the trusts are not the owners of the trust property?  The Florida Land Trust Act vests "both legal and equitable title, and full rights of ownership, over the trust property" in the trustee.  Fla. Stat. § 689.071(3) (2022).  Despite the trustee holding legal and equitable title and the full rights of ownership, the land trust beneficiary may, if so provided in the trust agreement, retain *any* beneficial interest in the trust property.[46] Fla. Stat. § 689.071(8)(b) (2022).  The Florida Land Trust Act defines "beneficial interest" as "any interest, vested or contingent and regardless of how small or minimal such interest may be, in a land trust which is held by a beneficiary."  Fla. Stat. § 689.071(2)(a) (2022).  The beneficial interest may be treated as personal property if the trust agreement designates it should be treated as such, otherwise the beneficial interest is treated as real property.[47]  Fla. Stat. § 689.071(6) (2022).

The framework for a Florida land trust places the *beneficial interest* in the trust property in the hands of the beneficiary while the trustee holds both the *equitable and legal title* to that trust property.  Fla. Stat. § 689.071(2)(a) & (3) (2022).  The Court addresses the practical effect of labeling the two trusts as Florida land trusts.

Under the facts here, the beneficiaries of Carswell Cherokee Trust are Johns's IRA, Terrell Sheen's IRA, and Cathy Sheen's IRA; the trustee of Carswell Cherokee Trust is

---

[46] The Florida Land Trust Act does not separately define "legal title" or "equitable title," but it does specify that both legal and equitable title vest in the trustee.  Fla. Stat. § 689.071(3) (2022).

[47] One effect of altering the personal- or real-property characterization of the beneficial interest is that the requirements to perfect a security interest in that beneficial interest are different based on the interest's characterization.  Fla. Stat. § 689.071(8)(c) (2022).  But perhaps the main benefit of a land trust is that the "'trustee may convey freely without the joinder of spouse or beneficiaries,' may 'deal with the trust property as if it were his own,' and third persons may 'deal with the trustee without having to inquire into his authority.'"  *Salkin v. Slobodinsky (In re Saber)*, 233 B.R. 547, 554 (Bankr. S.D. Fla. 1999) (quoting *Taylor v. Richmond's New Approach Ass'n, Inc.*, 351 So. 2d 1094, 1095–96 (Fla. 2d DCA 1977)).

Anderson; and Smith acts as the property manager.  For Southeast Financial Trust, the

beneficiary is Johns's IRA, and the trustee is Smith.

The Court holds some concerns about the legitimacy of the two land trusts because (1)

not all the assets of the trusts are land; and (2) the formalities of the Florida Land Trust Act may

not have been followed.[48]  And when a land trust fails for not complying with the Florida Land

Trust Act, that trust relationship is then governed by the Florida Trust Code.  *Brigham v.

Brigham*, 11 So. 3d 374, 383–84 (Fla. 3d DCA 2009).  The Trustee and Rutans have not made

this argument.  And these issues do not need to be conclusively answered because the framework

for determining the property of Johns's IRA and the two trusts reaches a similar result regardless

whether the Florida Land Trust Act or the Florida Trust Code governs the trusts.[49]

If the trusts are analyzed under the framework of an express trust governed by the Florida

Trust Code, the beneficiaries of the trusts hold a beneficial interest in the trust property.[50]  Fla.

---

[48] Deeds conveying land into a Florida Land Trust must include language that conveys land to a trustee and confers on that trustee certain powers and authorities. Fla. Stat. § 689.071(2)(c) & (3) (2022). That includes "the power and authority to protect, to conserve, to sell, to lease, to encumber, or otherwise to manage and dispose of the real property[.]" Fla. Stat. § 689.073(1) (2022). When a deed lists a trustee but fails to confer those powers and authorities onto the trustee, the deed creates an express trust governed by chapter 737, the Florida Trust Code, instead of the Florida Land Trust Act. *Brigham v. Brigham*, 11 So. 3d 374, 383–84 (Fla. 3d DCA 2009).

Here, the one deed in evidence that transfers property into one of the purported land trusts is a deed transferring realty in Washington state to Southeast Financial Trust (of which Johns's IRA is the 100% beneficiary). Trustee Ex. 36. That deed merely transfers property to "Southeast Financial Trust, Shannell Smith, Trustee[,]" without conferring the power "to protect, to conserve, to sell, to lease, to encumber, or otherwise to manage and dispose of the real property[.]" *See* Fla. Stat. § 689.073(1) (2022). But the Court should not assume all the property deeds lacked the language because that is only one deed, and that property was sold shortly after purchasing the land—the property was bought in June of 2018 and sold in July of 2018. Trustee Exs. 36 & 38.

[49] There are significant differences between the Florida Land Trust Act and the Florida Trust Code, but those differences are not at play when questioning who owns the property in this case. *See, e.g.*, *Freeman v. Berrin*, 352 So. 3d 452 (Fla. 2d DCA 2022) (comparing the duties owed by trustees of land trusts and express trusts and where those duties arise).

[50] One method of classifying trusts is by the manner of creation. AMY MORRIS HESS ET AL., BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 1 (June 2023 update). An *express trust* is when the settlor expresses intent to create a trust; a *resulting trust* comes into existence when the intent to create a trust is presumed or inferred; and a *constructive trust* is created by the court regardless of intent. *Id.* The Florida Trust Code applies to express trusts. Fla. Stat. § 736.0102(1) (2022).

Stat. § 736.0103(4) & (13) (2022). That beneficial interest is the interest intended by the settlor as provided under the trust terms. Fla. Stat. § 736.0103(13) (2022). The statute deviates from the traditional notions of trusts splitting the legal and equitable title. The trust instruments address ownership: "Trustee shall hold full legal and equitable title to said property" [Debtor Exs. 6 ¶ 2; 7 ¶ 2], while the trust instruments also provide that the beneficiaries—including Johns's IRA—retain a beneficial interest in the trust property [Debtor Exs. 6 ¶ 5; 7 ¶ 5].

Whether governed by the Florida Land Trust Act or the Florida Trust Code, Johns's IRA's beneficial interest is the right to receive proceeds, control the property, and instruct the trustee to convey property. This comports with a general understanding of a beneficial interest. *See* RESTATEMENT (THIRD) OF TRUSTS § 49 (2012) ("Except as limited by law or public policy[], the extent of the interest of a trust beneficiary depends upon the intention manifested by the settlor."); *Beneficial Interest*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("A right or expectancy in something … as opposed to legal title to that thing.").

The result is that the *trust* itself does not own any portion of the trust property; ownership is split between the beneficiary and the trustee. The trust instruments here provide that the beneficiaries hold rights to the trust property—and Johns's IRA is a beneficiary of the trusts.

The trust agreement that governs the Carswell Cherokee Trust provides that the beneficiaries include "Nuview IRA Inc. FBO William Johns Roth IRA." Trustee Ex. 25. The agreement contains language characterizing the beneficiaries' interest as personal property. Trustee Ex. 25 ¶ 5 ("No Beneficiary shall have any legal or equitable right, title or interest, as realty … but shall have only the rights, as personalty, set out below … .").[51] The agreement

---

[51] If the Carswell Cherokee Trust is an express trust, then it is likely that the clause can be given its intended effect. *See* HELEN S. SHAPO ET AL., BOGERT'S THE LAW OF TRUSTS AND TRUSTEES § 185 (June 2023 update) ("These clauses have been given their intended effect. They are in essence applications of the doctrine of equitable conversion, that is a change in the incidents of ownership of one type of property to those of another type."). But it is unnecessary to

grants three *rights* to the beneficiaries: (1) the right to direct the trustee to convey the trust property, (2) the right to manage and control the property, and (3) the right to receive proceeds from the property. *Id.* Johns's IRA is a beneficiary under the trust agreement and thus has the right to control the property and collect proceeds.

The interest of Johns's IRA in the property held in the Southeast Financial Trust is convoluted. The first confounding wrinkle concerns the trust property. The Florida Land Trust Act governs land trusts, and the property of a land trust means "any interest in *real* property." Fla. Stat. 689.071(2)(g) (2022) (emphasis added). The trust agreement governing Southeast Financial Trust comports with this requirement by stating: "The corpus of the trust will be *real property* …." Debtor Ex. 7 ¶ 2 (emphasis added). But the trust property is described in an attached exhibit to the trust instrument and is listed as a 49% interest in the limited liability company Amerifirst Portalet & Pump Service, LLC.[52] *Id.* at 8.

Fortunately, as described above, there is no substantive difference in the analysis of ownership whether Southeast Financial Trust is a land trust or an express trust. Specifically, the Southeast Financial Trust instrument provides that Johns's IRA, as sole beneficiary of the trust, retains the right to direct the trustee to convey title to the trust property, the right to participate in management and control of the trust property, and the right to receive proceeds from the trust property. Debtor Ex. 7 ¶ 5. The assets of the Southeast Financial Trust include an interest in

---

fully address that issue because the analysis of ownership treating Carswell Cherokee Trust as an express trust yields the same result as treating it as a land trust.

[52] The operating agreement for the Amerifirst Portalet & Pump Service, LLC specifies that the business purpose of the company is "[t]he ownership and operation of a toilet rental and pumping service company." Trustee Ex. 33 at 1. The management of real property was not a listed business purpose of Amerifirst Portalet & Pump Service (although ownership and management of realty may be incidental to owning and operating a toilet rental and pumping service company).

Amerifirst Portalet & Pump Service, LLC, the 127 El Terrace Trust, the 406 CDA Trust M/L, a

mobile home, and Amerifirst Portalet deposits.  Trustee Ex. 62.

Amerifirst Portalet & Pump Service, LLC's operating agreement specifies that it, the

LLC, and not its members, holds the personal and real property.  Trustee Ex. 33 at 3.  The

business is managed by its members.[53]  *Id*. at 1.  And each member's vote is based on their

percentage of capital contributed until all capital contributions have been repaid, at which point

the voting rights change by the percent interest of the members.  *Id.* at 2.  The operating

agreement provides that distributions are first made to repay the capital contributions of its

"managing members"; then, when the capital is repaid, the distributions are allocated based on

the member's percentage interest.  *Id*. at 4.  The capital contributions to Amerifirst Portalet &

Pump Service are: (1) Giving Joy 10-2015 Trust's $259,648.09 contribution for a 49% interest in

the LLC; (2) Southeast Financial Trust's $5,600 contribution for a 49% interest in the LLC; and

(3) the Magarts' contribution of time and effort for a 2% interest in the LLC.[54]  Trustee Ex. 33 at

3–4.

The foregoing discussion distills down to this: the assets of Johns's IRA are (1) the 49%

beneficial interest in Carswell Cherokee Trust—that beneficial interest is the right to direct the

trustee to convey the trust property, the right to manage and control the property, and the right to

receive proceeds from the property, and (2) a 100% beneficial interest in Southeast Financial

Trust, which includes the same rights as stated for the Carswell Cherokee Trust.

---

[53] The members of Amerifirst Portalet are Giving Joy 10-2015 Trust, Southeast Financial Trust, Katherine Magart, and Christopher Magart.  Trustee Ex. 33.

[54] Johns provided an exhibit demonstrating that Giving Joy Trust, after entering the operating agreement, made over $650,000 in capital contributions to Amerifirst Portalet & Pump Service.  Debtor Ex. 19.  It is not clear whether this amount includes the initial $259,648.09 contribution specified in the operating agreement.  *Compare* Debtor Ex. 19, *with* Trustee Ex. 33.

*(b) Disqualified Persons*

The next question is who is a *disqualified person* as defined by the Internal Revenue Code. *See* I.R.C. § 4975. The Internal Revenue Code provides a complex definition of a disqualified person that can be broken down piecemeal. I.R.C. § 4975(e)(2).

First, a disqualified person includes a fiduciary. I.R.C. § 4975(e)(2)(A). In the context of prohibited transactions, a fiduciary is any person who exercises any discretionary authority or control over the management of a plan (the IRA) *or its assets*. I.R.C. § 4975(e)(3)(A). As discussed below, those exercising control over the assets of Johns's IRA include Johns, Terrell Sheen, and Smith, and therefore they are fiduciaries and *disqualified persons* for purposes of § 4975.

To Johns,[55] he exercised authority and control over managing his IRA assets; he negotiated numerous business opportunities for the trusts—*e.g.*, the acquisition of Taylor Repo, Tam's Traveling Toilets, and Amerifirst Portalet and Pump Service.[56] Johns also discussed the actions needed to care for the Carswell Cherokee Trust property and occasionally assisted in the maintenance and collections for Carswell Cherokee Trust properties.

The testimony was replete with situations where Terrell Sheen issued some instruction or was consulted before action was taken regarding trust property, such as directing Anderson, Smith, and Johns in their dealings with the trust property.

---

[55] To clarify, this portion of the discussion is solely focused on whether Johns exercised *discretionary authority or control* over his IRA so that he is a fiduciary of his IRA, as opposed to any actions discussed later that address whether he engaged in prohibited transactions.

[56] A beneficiary of an IRA can also be a fiduciary of that IRA. *See In re Langston*, No. 19-33022, 2023 Bankr. LEXIS 1821, at *23 (Bankr. N.D. Tex. July 21, 2023) (Jernigan, J.).

Austin Sheen, through his trust (Giving Joy 10-2015 Trust), holds some amount of discretionary control over Amerifirst Portalet, although no evidence showed he exercised control.

Smith testified that she and Sheen make decisions regarding the various properties that she manages. She had business conversations with Johns but maintains that she ultimately decides what happens with the properties outside of Texas; she frequently stated that the "Texas office" is responsible for property within Texas.

The second relevant provision governing disqualified persons is § 4975(e)(2)(F), which specifies that family members of fiduciaries are also disqualified. Within § 4975, "the family of any individual shall include his spouse, ancestor, lineal descendant, and any spouse of a lineal descendant." I.R.C. § 4975(e)(6). Other relevant disqualified parties therefore include Cathy Sheen, Austin Sheen, and Mildred Johns (Johns's mother).

Regarding Anderson, although he was the trustee of Carswell Cherokee Trust, it is not clear that he exercised any control over the assets of the Carswell Cherokee Trust. Rather, the evidence indicates that he signed various deeds at the direction of Sheen. The evidence falls short of establishing that Anderson has the requisite amount of "discretion" required to be a fiduciary as defined in § 4975(e)(3) of the Internal Revenue Code.

*(c) Prohibited Transactions*

After identifying Johns's IRA's assets (certain rights to Carswell Cherokee Trust and Southeast Financial Trust property) and the disqualified persons (Johns, Sheen, Smith, Austin Sheen, Cathy Sheen, and Mildred Johns), the next step is to identify any "prohibited transaction" between the disqualified person and the plan (the IRA) *or* its assets.

Again, a prohibited transaction is "any direct or indirect" sale, exchange, lease, loan, or extension of credit; provision of goods, services, or facilities; transfer of plan income or assets for the benefit of a disqualified person; dealing by a fiduciary in the plan's income or assets for his benefit; or receipt by a disqualified person of consideration from any party dealing in a transaction involving the plan's income or assets.  I.R.C. § 4975(c).

Courts have interpreted the language "direct or indirect" broadly.  *Commissioner v. Keystone Consol. Indus., Inc.*, 508 U.S. 152, 159 (1993); *Peek v. Commissioner*, 140 T.C. 216, 225 (2013); *see Thiessen v. Commissioner*, 146 T.C. at 106–114.  An example of this is the tax court holding that a guaranty of a loan can be an indirect extension of credit.  *Thiessen*, 146 T.C. at 106–114; *Peek*, 140 T.C. at 224–25.

Here, several loans were made by a disqualified party; the effect of those loans added value to Johns's IRA.

From the beginning, Johns's IRA's first investment, through Carswell Cherokee Trust, was made by substantial loans from other beneficiaries of that trust.  The Sheens' IRAs made a loan of over $550,000 to Carswell Cherokee Trust, the proceeds of which were used for the purchase of the Taylor Repo assets for the benefit of Johns's and the Sheens' IRAs.  This arrangement fits squarely within I.R.C. § 4975(c)(1)(B), which defines the "lending of money or other extension of credit between a plan and a disqualified person" as a prohibited transaction— it was an indirect extension of credit to Johns's IRA.  Terrell Sheen is a disqualified person.  Johns's IRA (the plan) holds certain rights to Carswell Cherokee Trust's properties—specifically the right to receive income from its properties.  After the loan by a fiduciary (Sheen), Johns's IRA's right to receive income was expanded to encompass income from Taylor Repo properties.  The initial extension of credit from Sheen to Carswell Cherokee Trust is a prohibited transaction.

Also, as part of the Taylor Repo acquisition, Carswell Cherokee Trust signed a $1

million, non-interest-bearing promissory note payable to Terrell Sheen's IRA. Debtor Ex. 11.

This transaction is prohibited under I.R.C. § 4975(c)(1)(B), which prohibits extensions of credit

between an IRA and a disqualified person; the promissory note constitutes a guaranty to a

disqualified party where, ultimately, Johns's IRA's assets are subject to that guaranty.[57]

Like the Taylor Repo purchase, Johns failed to prove that the Hobbs transaction was not a

prohibited transaction. The evidence is, unsurprisingly, murky. The issue with the Hobbs

transaction concerns the source of the purchase funds: Sheen or Caleb Walsh. If the cash due at

the sale was provided by a loan from one of the Sheens' IRAs—as documented in Johns's

Amended Schedule of Assets and Liabilities filed on May 9, 2023 [ECF No. 295 at 5]—then the

transaction is prohibited by § 4975(c)(1)(B) of the Internal Revenue Code. But if that money

instead came from Caleb Walsh, as Johns testified, then the cash did not come from a

disqualified person and thus is not a prohibited transaction.

An unsworn declaration provided by Johns lists a debt owed to "Sheen's IRA" for the

downpayment in the Hobbs transaction. ECF No. 295 at 5. But when asked at trial about the

source of the downpayment, Johns initially responded that Caleb Walsh provided the funds.

Then to square the discrepancies, Johns claimed he didn't know how the money traded hands and

posited that the money could have flowed from Caleb Walsh to Sheen's IRA then to the title

company upon closing. But after reviewing the purchase agreements and the settlement

statements, it appears the only parties in the Hobbs transaction were Michael and Jill Hobbs

(sellers) and Hampton Beesley as trustee of Carswell Cherokee Trust (buyer). Debtor Ex. 12.

The settlement statement shows that $242,881.53 was due from the buyer [Debtor Ex. 12 at 38],

---

[57] *See supra* Background, Part II(A). Johns testified that the note was a "wrap-around" note that was issued to ensure
Sheen would be paid in the event that Carswell Cherokee Trust defaults on the debt owed to PrimeSouth Bank.

which matches the corresponding list of debt owed to Sheen's IRA in the balance sheet provided by Johns [ECF No. 295 at 5]. The evidence shows that the funds were treated by Smith, Sheen, and Johns as coming from Sheen. The Court concludes that Sheen's IRA loaned the funds for the Hobbs transaction to Carswell Cherokee Trust.

Smith transferred or used Johns's IRA's assets for her own benefit when she took commingled funds from the American Management Trust account that held funds of Carswell Cherokee Trust and by drawing her salary for managing Carswell Cherokee Trust property. She is a fiduciary of the plan (the IRA); those transactions are therefore prohibited transactions under § 4975(c)(1)(D) & (E). There is an exception in § 4975(d)(10), where the "receipt by a disqualified person of any reasonable compensation for services rendered … in the performance of his duties with the [IRA]" are not prohibited transactions. But the exception does not apply here because Smith's services were not rendered to the IRA (i.e., NuView) but to the assets of the IRA. *See Ellis v. Commissioner*, 787 F.3d 1213, 1217 (8th Cir. 2015) (holding that a taxpayer taking a salary for services rendered to an LLC owned by that taxpayer's IRA is a prohibited transaction, and the exception in § 4975(d)(10) does not apply.).

For the reasons below concerning Johns's engagement, the Court does not need to determine whether the America Management Trust account's payments for expenses of the Rideout Blalock Trust property, where Johns stays for up to a quarter of the year, were prohibited transactions.

The Trustee and Rutans argue that the IRA furnished facilities for Johns; those facilities were a small office in the main facility that Carswell Cherokee Trust operated in. Although true, the facilities were insubstantial.[58]

---

[58] Johns infrequently used a small area with a folding table at Carswell Cherokee Trust's office to make phone calls from his cell phone.

Like the initial acquisition of Carswell Cherokee Trust's properties, the contributions by Giving Joy 10-2015 Trust to Amerifirst Portalet were prohibited transactions—those contributions were made by, or on behalf of, Sheen's son, who is a disqualified person.

The guaranty issued by Johns as trustee of the Sheen Foundation 51 Trust to Tam's Traveling Toilets was an indirect extension of credit to Johns's IRA by a disqualified person.[59] *See, e.g.*, *Thiessen*, 146 T.C. at 106–114.

### 2. Johns's engagement

Several transactions fall within the definition of a prohibited transaction under I.R.C. § 4975(c). But to disqualify an IRA from its exempt status, the person for whom the IRA was established must *engage* in the prohibited transaction. I.R.C. § 408(e)(2)(A). In contrast, if the disqualified person who engages in the prohibited transaction is *not* the IRA's beneficiary, then a tax is imposed on the disqualified person. I.R.C. § 4975(a) & (b).

Of the transactions described above, the evidence shows Johns orchestrated the purchasing and financing of several business opportunities that arose: Carswell Cherokee Trust's acquisition of Taylor Repo, the funding of Amerifirst Portalet, and the collateralization of Sheen Foundation 51 Trust property. Using a self-directed IRA to invest in business opportunities is not inherently prohibited under the Internal Revenue Code, but the problem here arises from Johns's engagement in the financing of those investments. Fiduciaries of his IRA—those who exercise discretionary control over his IRA's assets—extended the credit used to purchase his IRA's investments. And the assets of his IRA were used as collateral for guaranties. Johns was integral to these extensions of credit. The facts of those transactions—where Carswell Cherokee Trust purchased Taylor Repo properties, Amerifirst Portalet's funding from Austin Sheen, and

---

[59] Tam's Traveling Toilet's assets became assets of Amerifirst Portalet, which is in turn partially held in the Southeast Financial Trust for the benefit of Johns's IRA. *See supra* Background, Part II(B).

Johns's use of Sheen Foundation 51 Trust property as security—establish that Johns "engaged in" those transactions.  These transactions are prohibited under I.R.C. § 4975(c)(1)(A) and (B).

The evidence does not establish that Johns paid Smith's salary or approved her borrowing from the accounts she managed.  And the evidence fails to show that Johns participated in the mortgage payments on the Rideout Blalock Trust property.

### 3.   The Prohibited Transaction Summary

To summarize the prohibited transaction analysis: Johns engaged in the negotiations and actions that caused large sums of money or credit to be extended to his IRA by virtue of its beneficial interest in the properties that were purchased with that credit.  The money was provided by disqualified persons through entities they controlled.

The first prohibited transaction occurred shortly after Johns created his IRA, with Sheen extending over half-a-million dollars for the purchase of Taylor Repo.  Johns found and negotiated the acquisition, and Sheen, a disqualified person, extended the financing (the prohibited transaction).  Because this was a prohibited transaction that Johns engaged in, the IRA is not in substantial compliance with and should not be afforded tax-exempt status under the Internal Revenue Code.  And Johns failed to prove that he was not materially responsible for the noncompliance.  Under § 522(b)(4), Johns may not exempt his IRA under § 522(d)(12).  This point fundamentally resolves the issue at hand and renders the excessive contributions and comingling issues moot for purposes of the objection to Johns's exemption.  *See In re Langston*, No. 19-33022-SGJ-7, 2023 Bankr. LEXIS 1821, at *37 n.77 (Bankr. N.D. Tex. July 21, 2023) (finding prohibited transactions rendered fund non-exempt and eliminated need to address issue of excess contributions).

## B. Excessive Contributions

The Court concludes the IRA loses its tax-exempt status because of the prohibited transactions.  This conclusion resolves the exemption issue against Johns.  The Court will, however, also address the charge of excessive contributions.  These are in two buckets: (1) the initial contributions he made above-and-beyond his taxed income, and (2) the enhancement of his IRA's value due to the transfers from Sheen into trusts that benefit Johns's IRA.

The Internal Revenue Code limits the amount a taxpayer may contribute to a Roth IRA.  I.R.C. § 408A(c)(2) & (3).  When that limit is passed, the amount of the excess is taxable income of the taxpayer.  I.R.C. § 4973(a) & (f).

The Trustee and Rutans claim that the initial funding of $19,000 to Johns's IRA, made over three years, was excessive because it exceeded Johns's income during the relevant years.  Johns insists that amended tax returns for each of the three years rectify this issue.  *See supra* Background, Part II.  The question is whether Johns's initial three contributions, totaling $19,000, were in excess.  And the crux of that question is *what limit applied to Johns*.

Considering that Johns was over the age of 50 when he made his contributions, the applicable limits for tax years 2016, 2017, and 2018 are the lesser of $6,500 for each year *or* the individual's taxable compensation for the same years.[60]  The problem is that Johns's original tax returns reflect his income was less than the allowable contributions.  Johns must have received at least as much "taxable compensation" as he contributed to his IRA.  That does not mean that he properly and timely paid taxes on that taxable income, however.  But this goes against the mechanics of a Roth IRA where the taxpayer *pays taxes* on his income *before* contributing that

---

[60] IRS Publication 590-A, Contributions to Individual Retirement Arrangements (IRAs), p. 41 (Dec. 29, 2016); IRS Publication 590-A, Contributions to Individual Retirement Arrangements (IRAs), p. 41 (Feb. 28, 2018); IRS Publication 590-A, Contributions to Individual Retirement Arrangements (IRAs), p. 39 (Dec. 21, 2018).

income to his Roth IRA so that he can enjoy non-taxed distributions later.  The caselaw on this issue is sparse, and the IRS publications and guidance assume the taxpayer properly reported all income.

The question is whether a taxpayer can remedy excessive contributions to an IRA by later reporting extra income and paying taxes on that income.  The Court questions the integrity of Johns's amended returns.  Johns's amended returns simply add *the amounts* of his purported contributions as income to his amended returns.  And this was done nearly two years after filing bankruptcy and, more important, after the Trustee and Rutans raised the issue of his having made excessive contributions.[61]

A debtor in bankruptcy is required to file a complete and accurate list of his creditors and schedules that identify *all* his assets and all his debts.  He must also file a statement of his financial affairs.  The debtor is guided on these requirements by promulgated forms that ensure the debtor is prompted to fully disclose these items.  The courts expect debtors' compliance with these basic requirements.  It is the price they pay for obtaining a discharge in bankruptcy.  Johns repeatedly testified that he was nothing more than a name and a signature for Sheen and that Sheen orchestrated the investments and businesses that Johns's IRA invested in.  Johns evaded basic questions concerning his income.  He testified that he had not had a bank account or a credit card in his name since the financial crises of 2007–2008.  Further, Johns's statement of financial affairs for the two years prior to his bankruptcy filing state that his income was $1,425 for 2019 and the "estimated" amount of $18,000 for 2020.

---

[61] Johns filed his chapter 7 bankruptcy petition and schedules on February 3, 2021; the Trustee and Rutans raised the excessive contributions issue in their objection to exemptions filed on January 6, 2022; and on November 28, 2022, Johns amended his returns to include the previously unreported income.

Johns's initial bankruptcy schedules reveal an individual that appears virtually destitute. They belie his ability to provide even the modest sum of $6,500 a year to his Roth IRA. The Trustee and Rutans contend Johns made excessive contributions to his IRA because he did not have sufficient income with which to make the contributions and thus such contributions must be excessive. To fix this charge, Johns simply filed amended tax returns to reflect the amount of contributions, the $19,000, as additional income to him for the years the contributions were made. He paid the taxes on this additional income and now submits that all is fine.

Red flags are raised when a debtor says he contributed $19,000 of funds he ostensibly did not have, that such $19,000 has a value of $250,000 a few years later, and that such value is exempt.

A chapter 7 bankruptcy case requires more candor than what Johns has provided. Johns offered no plausible explanation of how his reported income was less than half the amount of his contributions to the IRA and how his after-the-fact correction simply *matches* the amounts of his contributions. A debtor cannot absolve his deficiencies by simply addressing them *after* another party, or the Court, has raised the problem. Johns turned the process on its head. His "correction" is not plausible. The problem, however, is that the Court's skepticism is whether Johns has accurately reported *all* his income. Johns paid taxes on the additional amount that he did report under his amended returns. As a result, this issue has no practical effect here.

The Court briefly addresses the Trustee's and Rutans' contention that the loans (or contributions) made to Carswell Cherokee Trust and Southeast Financial Trust are contributions that also exceed the allowable contribution amount. The Internal Revenue Code defines the metes and bounds of taxpayer contributions to their Roth IRAs. *See* I.R.C. § 408A(c). The issue

is what constitutes a contribution to a Roth IRA.  The answer lies not in a statute but in the *substance* of the transactions indicating possible tax liability.

The Fifth Circuit has routinely held that a cardinal principle of income taxation is that a "transaction's tax consequences depend on its substance, not its form." *Southgate Master Fund, L.L.C. v. United States*, 659 F.3d 466, 478–79 (5th Cir. 2011).  Indeed, "[t]his principle is no schoolboy's rule; it is the cornerstone of sound taxation.... Tax law deals in economic realities, not legal abstractions." *Id*. (internal quotations and citations omitted).

The Trustee and Rutans evoke the substance-over-form principle to characterize transfers by third parties into trusts, for which the IRA benefits, as contributions.  Trial Br., ECF No. 315 at 20.

An example of this doctrine in action is found in *Paschall v. Commissioner*, 137 T.C. 8 (2011).  In *Paschall*, the taxpayers, husband and wife, acted on the advice of a partner at Grant Thornton (a reputable accounting firm).  *Id*. at 9–12.  The story begins with the husband's traditional IRA with a value exceeding $1 million.  *Id*. at 12–13.  The husband then established a self-directed traditional IRA, a self-directed Roth IRA, and two corporations (which the husband served in as president, secretary, and treasurer during all relevant times).  *Id*.  The self-directed Roth IRA was funded with $2,000.  *Id*. at 13.  The next step is that the original traditional IRA was rolled into the self-directed traditional IRA.  The self-directed traditional IRA then purchased all the shares of stock in one of the corporations for over $1 million, and the self-directed Roth IRA purchased all the stock of the other corporation for $2,000.  *Id*.  Then the corporation owned by the self-directed traditional IRA transferred *all* its assets to the corporation owned by the self-directed Roth IRA.  *Id*.  The corporation left with assets exceeding $1 million then transferred all of its assets to the self-directed Roth IRA, which then invested in various

securities and mutual funds.  *Id.*  Over a year later, the two corporations merged (although it is

unclear why the merger was needed).  *Id.*

      The taxpayers argued the Commissioner of the Internal Revenue Service improperly

calculated deficiencies based upon an excess contribution to the husband's Roth IRA.

Specifically, the taxpayers maintain that the $2,000 initial contribution was the only contribution

made to his self-directed Roth IRA.  *Id.* at 19.  The court disagreed because the series of

transactions, taken as a whole, showed the transactions themselves were shams with the only

purpose of achieving the anticipated tax consequences.  *Id.*  The court emphasized that:

> The substance of what happened in the instant case is that approximately $1.3
> million began the year in [the husband's] traditional IRA and was transferred to his
> Roth IRA by the end of the year with no taxes being paid. [The husband] did not
> attempt to provide a nontax business, financial, or investment purpose for what he
> did, and this Court cannot ascertain one. Instead, [the husband], incited by and at
> the urging of [his financial advisor], used corporate formations, transfers, and
> mergers in an attempt to avoid taxes and disguise excess contributions to his Roth
> IRA.

*Id.*

      The alleged contributions implicate the substance-over-form doctrine.

      Applying the doctrine to the case at hand is more nuanced than in *Paschall* because the

transfers came from third parties (albeit a fiduciary of the IRA for purposes of prohibited

transactions) and were made to trusts that benefit Johns's IRA.  Nonetheless, the substance of

what occurred is clear—Johns's Roth IRA received substantial value without paying tax.[62]  The

transactions in this case are "loans" made from Sheen—who *controls* assets of the IRA.  Taken

as a whole, what transpired in and around Johns's IRA is that Johns stands to reap substantial

value and tax benefits from this scheme.  The transactions that Johns and Sheen label as loans are

also treated as investment contributions to Johns's IRA.  When asked by the Court if the funds

---

[62] In a Roth IRA, taxes are paid on funds before they are contributed to the IRA.  *See* I.R.C. § 408A(c)(1).

going in from the Sheens were allocated as between the amount that constituted a loan and the
amount that was a capital contribution, counsel confirmed they were not but that it would have
been better had they been.

### C. Commingling

Under I.R.C. § 408, IRAs must not be commingled with other accounts, unless certain
criteria are met.  But the Court can sidestep the issue of whether the commingling that occurred
here—where assets of Johns's IRA were commingled in the American Management Trust
account—invalidated the IRA.  Because, with the burden shifting in § 522(b)(4), even when the
retirement fund fails to be in substantial compliance with the Internal Revenue Code, the debtor
can still satisfy the exemption if he shows that failure was not materially his fault.  Here, the
testimony was that Smith was responsible for the commingling within the America Management
Trust bank account.  To the extent of the commingling that did occur, Johns was not materially
responsible for it and thus the commingling itself does not invalidate his exemption.

## V.    Fair Notice

Johns objects to several matters as not having been raised in the pleadings.  In the Pre-
Trial Order, Johns claims thirty-four of the Trustee's and Rutans' issues of fact and fifty-nine of
their issues of law were not raised in the pleadings.  ECF No. 301 at 14 ¶ 13 & 22 ¶ 11.  Not all
the issues are pertinent to what the Court decides here.  The chief concern is whether the
Trustee's and Rutans' pleadings put Johns on notice that their allegations challenge transactions
related to his IRA as excessive contributions *and* prohibited transactions.[63]

---

[63] The most relevant objection Johns makes to the Trustee's and Rutans' issues of fact is to issue 14: "Did Debtor, in
his capacity of Trustee of Sheen Foundation 51 Trustee [*sic*], sign a note to secure a loan from Tam's Traveling Toilets
to APPS or SEFT?"  ECF No. 301 at 9 ¶ 14.  The relevant objections to the Trustee's and Rutans' issues of law are
to:

>    6. Whether Debtor's IRA engaged in credit extension prohibited transactions
>    …

Looking to the *original objection to exemption*, the basis in law for the objection is that

the IRA is not tax exempt due to prohibited transactions and excessive contributions and "such

contributions constitute prohibited transactions."  ECF No. 73 ¶ 14.  The objection to exemption

directs Johns to the statutory bases for the objection, and those same statutory provisions are

central to the Court's analysis here.  *Id.* ¶¶ 58–67.  The Trustee and Rutans included extensive

factual allegations that put Johns on notice of the charges made.  Johns was in the best position

to know the facts that support his exemption claim.

The *supplemental objection* is rooted in the same law: prohibited transactions and excess

contributions.  *See* ECF No. 306.[64]  But importantly, the supplemental objection continues to

paint the picture that certain contributions could also be prohibited transactions.

The Trustee's and Rutans' Supplemental Objection to Exemptions favors "excessive

contributions" as a descriptor more so than "prohibited transactions."  They cite an IRS notice in

support.  ECF No. 306, Summary, ¶ 58[65] (referencing IRS Notice 2004-8, 2004-4 I.R.B. 333).

---

32. Whether Shanell Smith, as trustee of the Southeast Financial Trust, is a
disqualified person under 26 U.S.C. §4975(e)(2)(A) as a fiduciary of the trust?
33. Whether Brian Anderson, as trustee of the Carswell Cherokee Trust, is a
disqualified person under 26 U.S.C. §4975(e)(2)(A) as a fiduciary of the trust?
34. Whether Shanell Smith is a disqualified party?
…
48. Whether Austin Sheen is a disqualified party?
…
56. Whether Terrell Sheen, as a party who controlled all the investments of the
Carswell Cherokee Trust is a disqualified person under 26 U.S.C. §4975(e)(2)(A)
as a fiduciary of the trust?
57. Whether Terrell Sheen is a disqualified party?
…
73. Whether Austin Sheen made excess contributions to CCT, APPS or SEFT?

ECF No. 301 at 15–21.

[64] The supplemental objection was originally filed October 3, 2022 [ECF No. 129], but due to a failure to redact
sensitive information, the supplemental objection was refiled with the necessary redactions on May 22, 2023 [ECF
No. 306].

[65] The paragraph numbering of the Supplemental Objection runs from 1–88 and then, under the heading Arguments
and Authority, starts with paragraph 48 and runs through paragraph 60.

The IRS Notice, however, goes on to say that the transactions (which the Trustee and Rutans categorize as contributions) can be prohibited transactions when the requirements listed in I.R.C. § 4975 are met.  IRS Notice 2004-8.

At page 29 of their Supplemental Objection, the Trustee and Rutans state the "above mentioned prohibited transactions" cause Johns's IRA to lose its exempt status under § 522(d)(12).  ECF No. 306.  The supplemental objection's factual background details "prohibited transactions" and identifies the following as prohibited transactions: "personal expense debits exceed[ing] $500,000";[66] "excessive contributions into Carswell Cherokee Trust";[67] "payment of personal expenses";[68] "improper loans from affiliated trusts and persons";[69] "excess contributions into the Southeast Financial Trust…";[70] and payments to and from Austin Sheen.[71]

There is significant overlap here on facts that support both the excessive contribution and prohibited transaction charges; and Johns was on notice of the facts and the law.  The Trustee's and Rutans' supplemental objection even nested factual allegations of excessive contributions within their prohibited transaction charge.  *See* ECF No. 306 at 21–25.  This is not a case where the Trustee and Rutans pursued an unpleaded legal theory.  *See generally* 2 MOORE'S FEDERAL

---

[66] ECF No. 306 at 21–22.

[67] These "contributions" are deposits made by third parties and "unidentified sources" into the American Management Trust bank account [ECF No. 306 at 22], as opposed to a cash contribution directly to Johns's NuView IRA.

[68] ECF No. 306 at 23.

[69] The specific loans identified in the supplemental objection are loans to Southeast Financial Trust from A Trust Services Trust and Shannell Smith.  ECF No. 306 at 23–24.

[70] The various "contributions" cited by the Trustee and Rutans are deposits made to a Wells Fargo account for Southeast Financial Trust.  ECF No. 306 at 24–25.

[71] ECF No. 306 at 25.

PRACTICE - CIVIL § 8.04[3] (2023); *Ruivo v. Wells Fargo Bank, N.A.*, 766 F.3d 87, 90–91 (1st

Cir. 2014); *Marie v. American Red Cross*, 771 F.3d 344, 365 (6th Cir. 2014).

Finally, in the *Joint Pre-Trial Order*, the Trustee and Rutans raise the same factual and

legal issues for their objections to the exemption claim.  Despite this, Johns objects to those

issues as not raised in the pleadings.  For example, the Trustee and Rutans list "[w]hether

Debtor's IRA engaged in credit extension prohibited transactions" as a contested issue of law.

ECF No. 301 at 15 ¶ 6.  The issue seems to be that the Trustee and Rutans previously categorized

the "loans" from third parties (often Terrell Sheen) as contributions and thus, Johns says, they

should be foreclosed from claiming those "loans" are prohibited transactions.  But framed as

such, the issue neglects to acknowledge that, as described above, the Trustee and Rutans have—

from the beginning—maintained that those transactions (or contributions as the Trustee and

Rutans label them) constitute prohibited transactions.  Besides, *Johns* maintains that

"contributions" take on the characterization of *both* loans and equity investments.  The same

dollars carry with them an obligation of repayment and the purchase of an equity interest.

Johns was fully on notice of the legal allegations made and had access to the relevant

facts to support his position.

Johns's IRA is part of a pyramid-like scheme orchestrated by Terrell Sheen.  Johns

contributed his $19,000 to NuView for the funding of his Roth IRA.  The IRA then invested in

two trusts, Carswell Cherokee Trust and Southeast Financial Trust.  As described herein, the two

trusts are specialty trusts, designated as Florida land trusts.  For Johns's IRA's contribution of

$13,000 to the Carswell Cherokee Trust, the IRA obtained a 49% interest in *the trust*; for its

$5,900 contribution to the Southeast Financial Trust, the IRA obtained a 100% interest in *the

trust*.  Beyond the level of the two trusts, the level at which *the trusts* are engaging in various

48

transactions and acquiring business interests, the trusts—both Carswell and Southeast

Financial—are making investments. As described, IRAs of which Sheen and his wife are the

beneficiaries made large contributions to the Carswell Cherokee Trust that thereby allowed it to

acquire interests in assets and other business ventures. And the Sheens' IRAs acquired an almost

half interest in *the Carswell Cherokee Trust*. Sheen's son, through yet another trust, Giving Joy

10-2015 Trust, made a similarly large contribution (or loan) to Amerifirst Portalet, the limited

liability company that constitutes the major asset of the Southeast Financial Trust. Amerifirst

Portalet, in fact, has made multiple investments in an array of business ventures that were mostly

funded by the contributions made to Amerifirst by the Sheens. But to further complicate the

analysis, all major "contributions"—those by the Sheens—are repayable as loans, despite also

constituting equity investments. And if this byzantine scheme is not sufficiently complicated, it

is compounded by Shanell Smith's "management" of funds from the various Sheen-and-Johns

related activities that were all run through and commingled in her personal bank account named

American Management Trust. The "trusts" are used as a means to separate the funds and assets

from the IRAs that benefit from the various "investments". The owners of the IRAs are the real

beneficiaries.

The Court provides the foregoing history to underscore the complexity and difficulty of

labeling the transactions that are alleged in the pleadings and were proven at trial. Johns, with

Sheen's guidance, helped orchestrate this scheme. The Trustee's and Rutans' objections, both

the original objection and the supplemental objection, clearly allege prohibited transactions, and

they carry this allegation forward in the pretrial order. Johns was placed on notice of the facts

and the legal bases for the objection to his exemption. "[A] pleading, or pretrial order, need not

specify in exact detail every possible theory of recovery—it must only give the defendant fair

notice of what the plaintiff's claim is and the grounds upon which it rests."[72]  *Thrift v. Hubbard*,

44 F.3d 348, 356 (5th Cir. 1995) (internal quotation marks and citation omitted).  Johns is the

party here that is responsible for knowing and explaining how his IRA is valued; he is *the*

beneficiary of the IRA.  And as discussed above, Johns has the burden to explain how his IRA

satisfies the requirements of the Internal Revenue Code and thus the conditions for qualifying as

a valid exemption under § 522(d)(12) of the Bankruptcy Code.  *See supra* Discussion, Part III.

Last, from a broader perspective, Johns's bankruptcy case is replete with red flags.  How

does a debtor that earns less than $3,000 a year make $19,000 in contributions to fund his self-

directed Roth IRA?  How does such $19,000 IRA turn into an IRA worth $250,000 (or perhaps,

much more) within three years?  How does a debtor satisfy his duty of candor and transparency

in his bankruptcy when he has maintained no bank accounts or owned a credit card for over

fourteen years?  And how does a debtor conveniently fail to report income in the *exact* amount of

the contributions made to his tax-exempt IRA?  Johns failed to satisfactorily resolve these

questions.

## CONCLUSION

Johns's IRA does not substantially comply with the Internal Revenue Code because of

the prohibited transactions in violation of I.R.C. § 408(e).  Johns played a major role in the

orchestration of prohibited transactions—including the negotiating and arranging of financing

with disqualified persons that was used to effectively shift value to his IRA.  Johns's IRA loses

its tax-exempt status and thus does not qualify as exempt under § 522(d)(12) of the Bankruptcy

Code.  This conclusion resolves the issues here.  The Court makes findings on but no dispositive

decision of the effect of alleged excessive contributions.

---

[72] The pleading standards exist to "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

### End of Memorandum Opinion ###